**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Spanish Broadcasting System, Inc., *et al.*, | Case No. 26-10708 (BLS) |
| Debtors.[1] | Joint Administration Requested |

**DECLARATION OF JESSE YORK IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Jesse York, hereby declare under penalty of perjury, as follows:

1.      I am the Chief Restructuring Officer (the "**CRO**") of Spanish Broadcasting System, Inc. ("**SBS**" and together with its affiliated debtors and debtors in possession, the "**Debtors**"), and its affiliates, and I am duly authorized to make this declaration (the "**Declaration**") on behalf of the Debtors.

2.      Prior to becoming the Debtors' CRO, I advised SBS in my capacity as a Senior Managing Director at Riveron RTS, LLC ("**Riveron**").  The Riveron team has served as one of the Debtors' principal financial advisors since April 2026.  In that capacity, and in my capacity as the Debtors' CRO, I have been directly involved and obtained first-hand knowledge of the events and circumstances leading to these chapter 11 cases, and I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and the Debtors' books and records.

3.      Except as otherwise indicated herein, the statements in this Declaration are based upon my personal knowledge, information supplied to me by the other members of the

---

[1]    The last four digits of Spanish Broadcasting System, Inc.'s federal tax identification number are 7791.  The mailing address for Spanish Broadcasting System, Inc. is 7007 NW 77th Ave., Miami, Florida 33166.  Due to the large number of Debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein but may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/SBS.

Debtors' management or the Debtors' professionals, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions and the industry in which the Debtors operate.  If called as a witness, I could and would competently testify to the matters set forth in this Declaration.

4.      I submit this Declaration in support of the Debtors' chapter 11 petitions and First Day Motions (as defined below) and to provide information to the Court and parties of interest regarding the Debtors.

5.      Today (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").  The Debtors intend to continue operating their business and managing their property as debtors in possession.

6.      Concurrently with this Declaration, the Debtors have filed various motions and applications seeking immediate or expedited relief (collectively, the "**First Day Motions**") to minimize the adverse effects of the Debtors filing for chapter 11 protection, and to enhance the Debtors' ability to maximize value through a prepackaged reorganization.  As further discussed below, I am familiar with the contents of each of the First Day Motions, and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue its business operations through the relief sought in the First Day Motions.

**PRELIMINARY STATEMENT**

7.      The Debtors commenced these chapter 11 cases to implement a consensual, comprehensive deleveraging transaction that will position the Debtors for long-term growth and success.  Crucially, this recapitalization will not impact the Debtors' customers and audience, programs and products, and vendor relationships.  It also will not disrupt the Debtors' business

2

operations or impair trade creditors or vendors, all of whom are expected to be paid in full in due course.  The comprehensive restructuring is designed to reduce the Debtors' funded indebtedness by more than three-quarters, from a current principal amount of $310 million to $70 million (subject to the addition of any additional financing upon or following exit from chapter 11).  This significant deleveraging will enable the Debtors and their management team to focus on and invest in long-term growth initiatives without the overhang of an unsustainable capital structure and overly burdensome debt service requirements.

8.      The Debtors are pleased to enter these cases with the support from over 90% of the holders of the Debtors' funded indebtedness.  These holders are party to a Restructuring Support Agreement dated April 3, 2026 (the "**Restructuring Support Agreement**") that provides the framework and essential terms of the Debtors' proposed restructuring.[2]  Consistent with the Restructuring Support Agreement, the Debtors began solicitation, and have filed and intend to expeditiously pursue confirmation, of their *Joint Pre-Packaged Chapter 11 Plan of Reorganization of Spanish Broadcasting System, Inc. and its Debtor Affiliates* (the "**Plan**").  While solicitation of the Plan "straddles" the Petition Date, given that the Debtors have already secured the support of the requisite majorities of their funded debt holders, the Debtors are fully confident that they have the votes needed to promptly confirm the Plan.

9.      As a broadcast media company, the Debtors' operations are subject to regulation and licensure by the Federal Communications Commission under the Communications Act and FCC rules and regulations promulgated thereunder.  The FCC's approval is therefore needed for the Debtors to execute on the restructuring transactions contemplated by the Restructuring Support Agreement and the Plan.  The Debtors intend to promptly apply for all

---

[2]     The Restructuring Support Agreement is attached as **Exhibit A**.

necessary approvals in parallel to pursuing their cases in this Court, and expect that approval will occur after the Plan is confirmed by this Court.

10.     To stabilize their business and ensure continuity of operations during these cases through confirmation of the Plan and FCC approval, the Debtors seek the relief set forth in the First Day Motions.  The First Day Motions reflect the prepackaged "full pay" nature of these cases and the Plan, and position and support the Debtors in pursuing a successful restructuring.  I am familiar with the contents of the Debtors' petitions and the First Day Motions, including the exhibits attached thereto, and believe that the relief sought is essential to ensure the uninterrupted operation of the Debtors' businesses and to maximize the value of the Debtors' estates.

11.     To familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors seek in the First Day Motions, this Declaration is organized as follows:

- **Part I** describes the Debtors' corporate organization, businesses, corporate history, and prepetition indebtedness;

- **Part II** describes the circumstances leading to the commencement of these chapter 11 cases;

- **Part III** discusses the Debtors' plan for these chapter 11 cases, including the DIP Facility and consensual use of cash collateral, the Debtors' proposed chapter 11 plan of reorganization, and the solicitation thereof; and

- **Part IV** provides support for the relief requested in the First Day Motions.

I.    COMPANY BACKGROUND

A.    **The Debtors' Corporate Organizational Structure**

12.    A chart depicting the corporate organizational structure of SBS and its Debtor-affiliates is attached to this Declaration as **Exhibit B** and is incorporated herein.

B.    **The Debtors' Businesses**

13.    The Debtors are a premier cross-platform media company connecting U.S. Hispanics across the United States through radio, television, and digital platforms.  Founded in 1983, and headquartered in Miami, Florida, the Debtors own and operate radio stations located in the top U.S. Hispanic markets of New York City, Los Angeles, Miami, Houston, Chicago, San Francisco, Orlando, Tampa, and Puerto Rico, and also operate AIRE Radio Networks, a national radio platform.  The Debtors also own MegaTV, a network television operation with over-the-air, cable, and satellite distribution, alongside a stable of digital properties, including LaMusica, a mobile app providing Latino-focused audio and video streaming content, and HitzMaker, a new-talent destination for aspiring artists.  In addition to cross-platform media distribution, the Debtors produce a nationwide roster of live concerts and events, and provide digital marketing solutions through DigIdea, a pure-play digital marketing department.

14.    The Debtors' revenue is primarily derived from the sale of advertising airtime to local, national, and network advertisers.  Local revenue generally consists of advertising airtime sold to local advertisers, while national and network revenues generally consist of advertising airtime sold to agencies purchasing advertising for multiple markets.  Local revenue includes local spot sales, integrated sales, sponsorship sales and paid programming (or infomercials).  National sales are generally facilitated by an outside national representation firm, which serves as an agent in these transactions.  Network sales consist of advertising airtime sold

on the AIRE Radio Networks platform by the Debtors' network sales staff.  In addition, the Debtors' digital revenue generally consists of advertisements placed on the LaMusica application or its digitally streamed stations.

15.    The Debtors' revenue is generally determined by the advertising rates and the number of advertisements that can be broadcast without jeopardizing listenership/viewership levels.  Each station broadcasts a predetermined number of advertisements per hour that is intended to maximize the station's revenue without negatively impacting the size of its audience.  While there may be shifts from time to time in the number of advertisements broadcast during a particular time of the day, the total number of advertisements broadcast on a particular station generally does not vary significantly from year to year.

16.    Historically, the Debtors' advertisement revenue also experiences significant increases during contested election seasons due to heightened demand for political advertisements.  Radio is the leading audio platform for Hispanic consumers, and it remains a favored medium for political outreach.

17.    The Debtors also generate special events revenue from concerts and other live events via ticket sales and licensing agreements.  Furthermore, the Debtors receive ancillary revenue such as rental income from renting available tower space or subchannels, subscriber revenue from cable and satellite providers, and various other non-broadcast-related revenues.  Additionally, the Debtors utilize barter sales agreements to reduce cash paid for operating costs and expenses by exchanging advertising airtime for goods or services.

*(i)    Radio Business*

18.    The Debtors operate 17 radio stations and own 3 of the top 6 six Spanish-language stations in the United States, including WSKQ, the number-one ranked U.S.

6

station in New York City, based on the average number of listeners per quarter-hour.  The Debtors also operate AIRE Radio Networks, which has over 250 U.S. Spanish-language affiliate radio stations serving 79 U.S. Hispanic markets.  AIRE Radio Networks covers 94% of the coveted U.S. Hispanic market and reaches 21 million listeners monthly.

19.     The Debtors' owned and operated radio stations have a strong foothold in the top U.S. Hispanic markets of Los Angeles, New York, Miami, Houston, Chicago, San Francisco, Orlando, Tampa, and Puerto Rico, where Spanish-language speakers represent a significant portion of the markets' population.  The Los Angeles and New York markets have the largest and second largest Hispanic populations and are also the largest and second largest radio markets in the United States measured by advertising revenue, respectively.

20.     The U.S. Hispanic population is diverse, consisting of numerous identifiable ethnic groups from many different countries of origin, and each ethnic group has its own musical and cultural heritage.  Since the music, culture, customs, and Spanish dialects vary from one radio market to another, the Debtors strive to maintain familiarity with the musical tastes and preferences of each of the various Hispanic ethnic groups by customizing the programming format of each radio station to capture a substantial share of the Hispanic audience and to match the local preferences of a target demographic audience in a specific market.

### (ii)     *Television Business*

21.     The Debtors' television stations and related affiliates operate under the "MegaTV" brand.  The Debtors broadcast via owned and operated television stations in South Florida and through programming and/or distribution agreements, including nationally on a subscriber basis.  The Debtors have created a unique television format that focuses on entertainment, current events, and variety with high-quality content programming that is formatted

to capture a larger share of the U.S. Hispanic audience by focusing on the Debtors' core strengths as an entertainment company, thus offering an alternative compared to the traditional Hispanic television channels.  MegaTV's programming is based on a strategy designed to showcase a combination of programs, ranging from televised radio-branded shows to general entertainment programs, such as music, celebrity news, debate, interviews, and personality-based shows.  As part of a broader business strategy, the Debtors also incorporate certain on-air radio personalities into the Debtors' television programming.

### (iii)    *Internet and Digital Content Business*

22.    The Debtors operate multiple Spanish and bilingual websites, including www.lamusica.com, that provide content related to Latin music, entertainment, news, and culture, as well as the LaMusica mobile application and HitzMaker, a new-talent destination for aspiring artists.  The LaMusica mobile application is a music and entertainment video and audio application that programs an extensive series of short form videos, simultaneously live streams the Debtors' radio stations, includes curated playlists, and has tools that enable users to personalize their mobile radio streaming experience, all of which enhance the audience's engagement level and increase the reach of the Debtors' mobile offering.

23.    In addition to radio and television, the Debtors also provide digital marketing solutions through the pure-play digital marketing department, DigIdea, and access to the digital realm where brands can explore a diverse range of engaging content, unlock valuable insights, and connect with the podcast community.

### (iv)    *Live Concerts and Events Business*

24.    The Debtors normally produce over 40 live concerts, events, and live activations annually in the contiguous United States and Puerto Rico, through the SBS

Entertainment business that attracts over 130,000 attendees. Marquee events include CaliBash, Cubatonazo, MegaBash, MiamiBash and Mega Mezcla, which are typically sold out annually. Concerts generate revenue from ticket sales, sponsorship and promotions, fees from licensing agreements, as well as profit-sharing arrangements for producing or co-producing live concerts and events promoted by the Debtors' radio stations and digital properties. These events also raise awareness for brands in the surrounding communities, which in turn provides the Debtors' advertising partners additional opportunities to reach their target audiences.

### C.    The Debtors' Corporate History

25.    Founded in 1983, SBS reincorporated in Delaware in 1994, and completed one of the largest initial public offerings in radio history in 1999.

26.    Throughout the 1980s and 1990s, SBS continued to grow its influence in both South Florida and the contiguous United States by acquiring radio stations in major U.S. cities such as New York City, Los Angeles, Chicago, San Francisco, Dallas, and San Antonio.

27.    In the early 2000s, SBS completed the consolidation of the largest radio group in Puerto Rico and opened a broadcast complex on the island.

28.    SBS continued to acquire, and occasionally sell, radio stations throughout the 2000s, and in 2006 SBS launched MegaTV in the contiguous United States, which went on to win five Emmy awards during its first year of operations. MegaTV expanded to Puerto Rico in 2008.

29.    In the 2010s, SBS established and grew the AIRE affiliate radio network, established the LaMusica.com website, and launched the LaMusica and HitzMaker mobile apps.

30.    In 2019, SBS's Mega 97.9 station in New York City was declared the most-listened-to Hispanic radio station in the world.

9

31. SBS was required to file periodic reports with the SEC until 2020, when SBS filed a *Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Sections 13 and 15(d) of the Securities Exchange Act of 1934*, which terminated the registration of SBS's securities and suspended SBS's obligation to file periodic reports.

**D.     The Debtors' Prepetition Indebtedness**

32. As of the Petition Date, the Debtors' capital structure consists of outstanding secured funded-debt obligations in the aggregate principal amount of $310,000,000.00 under the Existing Notes (defined below), plus additional trade and ordinary course obligations. SBS's prepetition funded debt and other prepetition obligations are summarized further below, and SBS's current capital ownership structure is as follows:

a.     As of September 30, 2025, 380,000 shares of Series C preferred stock were outstanding. Raúl Alarcón, Jr., the Chairman of the Board and Chief Executive Officer, is the beneficial owner of all the shares of Series C preferred stock which are convertible into 760,000 shares of Class A common stock, subject to certain adjustments.

b.     As of September 30, 2025, 2,340,353 shares of Class B common stock, which have ten votes per share, were outstanding. Raúl Alarcón Jr. has voting control over all but 350 shares of the Class B common stock.

c.     As of September 30, 2025, 6,223,374 shares of Class A common stock were outstanding.

d.     As of September 30, 2025, there were approximately 81 record holders of Class A common stock, three record holders of Class B common stock and one record holder of Series C preferred stock. These figures do not include an estimate of the indeterminate number of beneficial holders whose shares may be held of record by brokerage firms and clearing agencies.

e.     There is no established public trading market for SBS's Class B common stock or Series C preferred stock. The Class B common stock is convertible into Class A common stock on a share-for-share basis, and each share of the Series C preferred stock is convertible into two shares of Class A common stock.

10

#### (i)    *The Prepetition 9.75% Senior Secured Notes*

33.    On February 17, 2021, SBS completed a private offering of $310 million in aggregate principal amount of 9.75% Senior Secured Notes due 2026 (as defined in the Plan, the "**Existing Notes**").  Interest on the Existing Notes accrues at the rate of 9.75% per annum and is payable semi-annually in arrears on March 1 and September 1, beginning on September 1, 2021.

34.    The Existing Notes matured on March 1, 2026.  On March 6, 2026, the Debtors entered into a Forbearance Agreement (as defined below) with certain holders of the Existing Notes to address the maturity.  As of the close of business on March 6, 2026, the Debtors were unconditionally indebted to the holders of the Existing Notes in respect of the Existing Notes Claims in an aggregate principal amount of not less than $310,000,000.00 and accrued and unpaid interest thereon (including interest on overdue interest and principal) of not less than $15,552,756.51, and all fees, costs, expenses, interest, premiums, make-wholes, reimbursement obligations, and other sums and charges now or hereafter payable by SBS to the holders of the Existing Notes pursuant to the Existing Notes Documents (as defined in the Plan).

#### (ii)    *Payoff and Termination of Revolver Facility*

35.    Concurrently with completing the Existing Notes offering on February 17, 2021, SBS entered into a senior secured asset-based revolving credit facility (the "**Revolver**") providing for borrowings of up to $15.0 million, subject to compliance with a borrowing base.  All obligations under the Revolver were secured by (a) a first-priority lien on all accounts receivable, cash, deposit accounts, and proceeds thereof held by SBS and the guarantors and (b) a first lien, *pari passu* with the Existing Notes, on all other assets held by SBS and its Debtor affiliate guarantors.  On October 20, 2025, prior to the October 27, 2025, maturity date of the Revolver, SBS prepaid the outstanding balance on the Revolver in full and terminated the facility.

### *(iii)*     *Trade Obligations*

36.     As of the Petition Date, the Debtors estimate that they have approximately $15,000,000 in unpaid trade payables.

## II.     CIRCUMSTANCES LEADING TO THE CHAPTER 11 CASES

### *(i)*     *Macroeconomic Trends*

37.     SBS derives the majority of its revenue from its radio stations operating across the United States in the form of on-air advertisements.  However, the rise of on-demand streaming and podcasting has shifted consumption patterns for audio entertainment and drawn its audience away from linear radio.  Younger audience members have spread their attention across multiple digital ecosystems, and those changes have been mirrored by both local and national advertisers, lessening radio's position as a primary advertisement space and making it challenging to drive consistent top-end growth.  As advertisement campaigns increase in scope and platform, the baseline technology requirements have increased as well, further driving up operational costs across radio, television, and digital media.  At the same time, costs associated with licensing music and hiring entertainment talent have also increased, and the recent period of high leverage and constrained investment capacity in the capital markets has limited SBS's options to further invest in the growing digital and internet space.

### *(ii)*     *Political Environment*

38.     SBS historically generates significant revenue from political advertisements during midterm and presidential election cycles.  However, because SBS's major market areas of New York, Florida, California, and Illinois have not been considered swing states in recent election cycles, revenue from political advertisements has declined in recent years.  Nevertheless, SBS

remains hopeful that the 2026 midterm election will spur increased spending on political advertisements.

### (iii)    *Disruptions in the Los Angeles Market*

39.    Los Angeles is one of the largest U.S. Hispanic markets by size, and in 2025, SBS's operating results were impacted by a decrease in overall broadcast advertising and an increase in non-cash impairment charges due to uncertain market conditions and the wildfires that affected the Los Angeles area in January 2025.

### (iv)    *Prepetition Restructuring Efforts, Existing Notes Maturity, Forbearance Agreement, and Restructuring Support Agreement*

40.    In October 2025, the Debtors, with Fried, Frank, Harris, Shriver & Jacobson LLP, as legal counsel, and GLC Investment Advisors, LLC as investment banker and financial advisor, began efforts in earnest to analyze their capital structure and pursue a potential restructuring transaction to address the upcoming maturity of the Existing Notes.  Over the next several months, the Debtors engaged in discussions regarding potential transactions with an ad hoc committee of holders of their Existing Notes (the "**Ad Hoc Committee**"), represented by Milbank LLP and M3 Advisory Partners, LP.

41.    In the course of those efforts, the Existing Notes matured on March 1, 2026. The Debtors were unable to pay at maturity the $310 million principal amount and accrued unpaid interest.  As a result, on March 6, 2026, the Debtors entered into a 30-day forbearance agreement (the "**Forbearance Agreement**") with the Ad Hoc Committee to address the maturity of the Existing Notes and strengthen the company's financial position.  Thereafter, the Debtors appointed Carney Hawks as an independent, disinterested director to the boards of directors of all the Debtors' entities.  The Debtors and the Ad Hoc Committee continued discussions regarding consensual, arm's-length restructuring transactions.

42.     As a result of these efforts, on April 3, 2026, the Debtors entered into the Restructuring Support Agreement, which contemplates an in-court restructuring of the Debtors through a prepackaged chapter 11 plan of reorganization funded by a debtor-in-possession financing facility provided by the Ad Hoc Committee.  At around the same time, the Debtors retained Morris, Nichols, Arsht & Tunnell LLP, as Delaware local counsel, and thereafter retained Riveron RTS, LLC, as financial advisor, to prepare for the in-court restructuring contemplated by the Restructuring Support Agreement.  Subsequently, Riveron Management Services, LLC, was retained to provide my services as Chief Restructuring Officer, superseding the Riveron RTS, LLC engagement.

43.     As detailed herein, the Restructuring Support Agreement provides for a comprehensive balance sheet restructuring that is expected to significantly reduce the Debtors' debt and set them up for long-term success.

## III.    IMPLEMENTATION OF THESE CHAPTER 11 CASES

44.     The Debtors intend to use these chapter 11 cases to pursue the prepackaged Plan, in accordance with the Restructuring Support Agreement, and position the Reorganized Debtors to emerge from bankruptcy with a significantly deleveraged balance sheet and manageable interest burden.  This deleveraging will enable the Debtors and their management team to focus on long-term growth opportunities and reinvesting in their business, without the overhang of an unsustainable capital structure and unmanageable interest expense.

### A.    The DIP Facility and Use of Cash Collateral

45.     In tandem with negotiations preparing for these cases, my team at Riveron and I, together with the Debtors' advisors, worked closely with the Debtors to determine and size their liquidity needs to sustain operations through the chapter 11 cases and pay for restructuring

expenses.   Based on our work, we determined that use of cash collateral alone would be insufficient, and the Debtors therefore would require access to debtor-in-possession financing.

46.    The Debtors have obtained a commitment for a $30 million term loan debtor-in-possession financing facility (the "**DIP Facility**"), pursuant to the terms of that certain DIP Credit Agreement filed with the Debtors' debtor-in-possession finacing motion (the "**DIP Motion**").   Through the DIP Motion, the Debtors seek Court approval of the DIP Facility, which, in addition to the $30 million commitments, provides for the use of cash collateral, and is subject to the payment of certain fees and interest, as set forth therein.   The DIP Facility is being backstopped by certain holders of Existing Notes, and all holders of Existing Notes will be provided an opportunity to participate in the DIP Facility on a Pro Rata basis according to their prepetition holdings of Existing Notes.   Any holder of Existing Notes that elects to participate in the DIP Facility must also sign and remain in compliance with the Restructuring Support Agreement.

47.    The DIP Facility and use of cash collateral are critical components of these chapter 11 cases and necessary to fund these cases.   In connection with preparation for their cases, the Debtors and their advisors evaluated the Debtors' liquidity position and developed projections (as may be updated from time to time in accordance with the terms of the DIP Facility, the "**Approved Budget**") of postpetition cash needs for the Debtors' businesses in the initial 13 weeks of these chapter 11 cases (including detailed line items for categories of cash flows anticipated to be received or disbursed during this period), as well as longer-term monthly forecasts, to determine the amount of postpetition financing required to administer these cases.   The DIP Facility was negotiated and sized based on the Approved Budget, and the Debtors believe that the DIP Facility,

combined with uses of cash collateral, is adequate to fund these cases through the Effective Date of the Plan.

48.     The DIP Facility and use of cash collateral were the result of arm's-length, good faith negotiations with the lenders thereunder, and are on the best available commercial terms under the circumstances.  As set forth in the *Declaration of Tim Hagamen in Support of the Debtors' Motion for Interim and Final Orders (I) Authorizing Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, the Debtors' investment banker, GLC, undertook a market process to locate alternative sources of debtor-in-possession financing, and no parties were willing to provide financing on superior terms to the DIP Facility.

**B.     The Debtors' Prepackaged Chapter 11 Plan**

49.     The Debtors have filed their prepackaged Plan with their petitions and began prepetition a "straddle" solicitation of votes from holders of Existing Notes—the only impaired, voting class under the Plan.

50.     The Plan accomplishes the following key restructuring transactions:[3]

1.     The Debtors will implement a comprehensive restructuring of the Debtors' capital structure in accordance with the Restructuring Support Agreement;

2.     The Existing Notes will be cancelled in exchange for the issuance of New Secured Notes and New Common Stock by Reorganized SBS on the Effective Date, except that the Existing Indenture will remain in effect;

---

[3]     The summary of the Plan contained herein is qualified in its entirety by the terms of the Plan, and in the event of any inconsistency, the Plan shall control in all respects.  Undefined terms used in this Declaration shall have the meanings ascribed to them in the Plan.

3.     The Debtors' FCC licenses will undergo a Transfer of Control in connection with the issuance of the New Common Stock;

4.     Allowed General Unsecured Claims will be Unimpaired and will receive payment in full;

5.     All Allowed Priority Tax Claims, Administrative Claims, Other Priority Claims, and Other Secured Claims are Unimpaired and will receive payment in full;

6.     All property in the Debtors' Estates, and any property acquired by the Debtors through the Plan, will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances, subject to the potential sale of certain non-core assets; and

7.     All existing preferred and common equity interests will be cancelled and receive no consideration.

51.     As previously mentioned, on the morning of May 11, 2026, prior to the filing of the Debtors' voluntary petitions, the Debtors' advisors, including Kroll Restructuring Administration LLC ("**Kroll**"), commenced solicitation of the Plan by sending copies of the Plan, Disclosure Statement, and applicable ballots to all impaired holders of Existing Notes entitled to vote on the Plan.  Solicitation and the tabulation of votes was and is to be conducted in the manner described in the Solicitation Motion.  As previously mentioned, the Debtors have secured support of the Plan from over 90% of the holders of Existing Notes, and therefore anticipate having the requisite votes to confirm the Plan.

52.     In connection with the Plan approval process and the First Day Motions, the Restructuring Support Agreement also contemplates that the Debtors will achieve certain milestones over the course of these chapter 11 cases.  The milestones are as follows:

17

| Milestone | Deadline |
|---|---|
| Petition Date | No later than May 23, 2026 |
| Debtors shall have filed the First Day Pleadings, the Disclosure Statement, and the Plan | Within one (1) Business Day of the Petition Date |
| Entry of the Interim DIP Order | Within three (3) Business Days of the Petition Date |
| Entry of the Final DIP Order | No later than 55 days after the Petition Date (but likely to occur within 30 days of the Petition Date) |
| Entry of the (Combined) Disclosure Statement Order and Confirmation Order | No later than 55 days after the Petition Date |
| Plan Effective Date | No later than 180 days following entry of the Confirmation Order |

53.     In line with these milestones, the Debtors request a combined hearing to consider approval of the Plan and Disclosure Statement for the week of June 22, 2026, which is approximately 40 to 45 days following the Petition Date.

54.     The milestone for the Plan Effective Date—no later than 180 days following entry of an order confirming the Plan—is considerably further out than the plan effective date milestones in many prepackaged cases.  This additional time is intentional to allow time for FCC approval of the change of control that will occur under the Plan.

## IV.     FIRST DAY MOTIONS

55.     In my capacity as Chief Restructuring Officer of SBS, I believe that the relief requested in the First Day Motions is necessary and essential to ensuring that the Debtors' immediate needs are met, and that the Debtors (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of these chapter 11 cases.  My opinion as to the necessity of the First Day Motions is based upon my firsthand experience as Chief Restructuring Officer, and my review of various materials and information provided to me by the Debtors and Debtors' advisors, as well as discussions had in connection therewith.  In considering the necessary first-day relief, the Debtors' advisors and I were cognizant of the level of cash on hand and the limitations imposed by the cash collateral and/or DIP budgets and, in light of these

18

limitations, narrowed the relief requested at the outset of the chapter 11 cases to only those matters that require urgent relief to preserve value during the pendency of these cases.

56.     I have reviewed each of the following First Day Motions (including the exhibits and schedules thereto) and am familiar with the content and substance contained therein:

- *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Maintain Employee Programs, and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Honor Certain Prepetition and Postpetition Obligations Related Thereto, (C) Maintain Their Bank Accounts and Existing Business Forms, (D) Implement Changes to the Existing Cash Management System as Necessary, and (E) Continue Ordinary Course Intercompany Transactions; (II) Provide Limited Relief from the Requirements of 11 U.S.C. § 345(b) and the U.S. Trustee's Operating Guidelines; and (III) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers and Authorizing Debtors to Provide Additional Assurance, (III) Establishing Procedures to Resolve Requests for Additional Assurance and (IV) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor and Continue Customer Programs and Customer Obligations and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing (I) the Debtors to Pay Certain Prepetition Taxes and Fees, (II) Financial Institutions to Honor and Process Related Checks and Transfers, and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Policies and Agreements Relating Thereto in the Ordinary Course of Business, Including Premium Finance Agreements, (B) Honor Certain Prepetition Obligations in Respect Thereof, and (C) Renew, Revise, Extend, Supplement, Change or Enter Into New Insurance Coverage and Premium Finance Agreements as Needed in Their Business Judgment, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders for (I) Authority to Pay or Honor Prepetition Trade Claims in the Ordinary Course, and (II) Related Relief;* and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to SBS Stock and (II) Granting Related Relief.*

The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other advisors, and I can attest to such facts.

I declare under penalty of perjury that the foregoing is true and correct to the best of knowledge, information, and belief.

Dated: May 11, 2026               */s/ Jesse York*_____
                                  Jesse York
                                  Spanish Broadcasting System, Inc.
                                  Chief Restructuring Officer